UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ISAIAH SCHUBERT,

        Plaintiff,

v.

CHERYL STRANGE, *et al.*,

        Defendants.

CASE NO. 2:21-cv-01070-RJB-JRC

REPORT AND RECOMMENDATION

NOTED FOR: November 5, 2021

This 42 U.S.C. § 1983 civil rights matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A)–(B) and Local Magistrate Judge Rules 1, 3, and 4. Before the Court is plaintiff's motion for a temporary restraining order ("TRO") and preliminary injunctive relief. Dkt. 8.[1]

Plaintiff, who proceeds *pro se* and who is incarcerated in the Washington State Reformatory facility ("WSR") at the Monroe Correctional Center ("MCC"), brings suit to

---

[1] Plaintiff filed an amended motion for temporary restraining order, then voluntarily withdrew that amended motion. Dkts. 15, 18. Therefore, the Court considers only the arguments and materials filed with the original temporary restraining motion, Dkt. 8.

REPORT AND RECOMMENDATION - 1

challenge the ongoing consolidation of units at WSR, resulting in plaintiff being double-celled with another prisoner. Dkt. 7. He has filed the pending motion on the basis that conditions resulting from double-celling at the WSR during the COVID-19 pandemic violate his Eighth Amendment right to be free from cruel and unusual punishment, and he requests that the Court order defendants to cease double-bunking at WSR and transporting prisoners to other institutions. Dkt. 8, at 12.

However, the Court cannot grant a broad preliminary injunction directing the WSR to cease double-bunking and return to the prior residential arrangements on the basis of plaintiff's allegations that conditions in COVID-19 segregation units are discouraging prisoners from self-reporting symptoms. Such would violate federal law that circumscribes the Court's authority to enter preliminary injunctions unless the relief is narrowly drawn and extends no further than necessary to correct the harm that the court finds requires preliminary injunctive relief. Nor can the Court grant an injunction ordering the WSR to cease transporting prisoners, where such transportation is not related to the three claims in plaintiff's complaint. Finally, plaintiff has failed to show a likelihood of success on the merits of his claim that consolidation of units has led to overcrowded conditions that violate the Eighth Amendment. Therefore, his motion for a TRO/preliminary injunction should be denied.

**BACKGROUND**

**I. Introduction**

Plaintiff initiated this suit in August 2021. Dkt. 1. The Court granted plaintiff permission to proceed *in forma pauperis* ("IFP") and served his complaint. Dkts. 6, 7. The Court also directed defendants to respond to the pending motion. Dkt. 14.

1    Plaintiff brings suit against the Department of Corrections ("DOC") secretary and the
2  WSR superintendent and "CPM." Dkt. 7, at 3.  In the complaint, he alleges that these defendants
3  are violating his rights to be free from cruel and unusual punishment, to due process, and to
4  equal protection by consolidating units at the WSR.  *See* Dkt. 7.  He alleges that this
5  consolidation has resulted in stripping individuals of their privileges without just cause and that
6  prisoners are overcrowded and are suffering from a lack of adequate ventilation, loud noise,
7  sleep deprivation, and discomfort and humiliation from shared cell bathrooms.  Dkt. 7, at 6–8.
8  He alleges that overcrowding has already resulted in "life[]rs" forcing "lower custodies" out of
9  double-bunked cells and that an outbreak of violence is imminent.  Dkt. 7, at 8.  Plaintiff alleges
10 that conditions at WSR place him at an increased risk of contracting COVID-19.  Dkt. 7, at 8.

11   **II. Plaintiff's Evidence**

12    Plaintiff's motion for injunctive relief is premised on his argument that conditions at the
13 WSR during COVID-19 (particularly double-celling) allegedly violate his right to be free from
14 cruel and unusual punishment.  He appears to also challenge the planned transfer of prisoners,
15 including himself, out of WSR to other institutions, as WSR is closed down entirely.  *See* Dkt. 8,
16 at 9, 12.

17    Plaintiff asserts that the consolidation of four living units at the WSR into the remaining
18 two living units resulted in single-cell occupants being double-celled with other prisoners in
19 medium custody units.  Dkt. 8, at 7.  According to plaintiff, under a previous consent decree that
20 has since been vacated, the facility's capacity was capped at a "single bed capacity of 656." Dkt.
21 8, at 7. Another prisoner's declaration provided in support of the motion for a TRO states that a
22 medium custody cell is 45 square feet and extremely cramped for two people, including
23 requiring one to "sit on [the] toilet sideways[.]"  Dkt. 29, at 90.

24

Under current conditions, plaintiff asserts that he is forced to wear a mask but is unable to control how close he must stand to another person and that he has to breath the air in a confined space with others, any of whom could have COVID-19. Dkt. 8, at 6. He alleges that threats of violence are ongoing and that the same number of guards are now working with nearly twice the number of incarcerated people to watch over. Dkt. 8, at 7; Dkt. 29, at 4. And he asserts that other than face masks, preventative measures are not being offered to prisoners at the WSR. *See* Dkt. 28, at 3, 84. According to plaintiff, COVID-19 guidelines relied upon by DOC are "purely for show and tell," and plaintiff claims that he is not aware of any prisoners being tested. Dkt. 29, at 5.

Plaintiff asserts that COVID "has continued to break out through out this facility and facilities across the state" of Washington. Dkt. 8, at 1. Plaintiff cites the example of a vaccinated corrections officer, who recently contracted COVID-19 from plaintiff's unit. Dkt. 29, at 4. He claims that defendants are not "correctly" reporting the outbreak and are rushing the closing of the WSR, which will occur by the beginning of September. Dkt. 8, at 1, 7. *But see* Dkt. 24, at 4 (stating that DOC anticipates closure in October 2021). Plaintiff asserts that defendants "have dismantled all covid stations and are back to just throwing prisoner[s] back into Punitive isolation when discovered with covid symptoms." Dkt. 8, at 1. He claims that conditions in the COVID-19 units are "punitive" and that prisoners in them are not allowed to "bring anything or have anything[.]" Dkt. 28, at 10. In his declaration, plaintiff states that defendants previously allowed individuals in "Covid Station/units" to bring personal property with them. Dkt. 29, at 1. Plaintiff states that he recently became ill but refuses to self-report because he does not want to be placed in punitive segregation. Dkt. 29, at 2; *see also* Dkt. 29, at 28, 79, 83, 87, 107, 110.

1    Plaintiff also relies on various documents related to a civil rights lawsuit brought by a
2    different WSR prisoner.  *See* Dkt. 29, at 6–27.  This prisoner states that two prisoners recently
3    transferred to the Monroe facility have tested positive for COVID-19 and that there is a positive
4    case in the WSR infirmary.  Dkt. 29, at 31.  Plaintiff also provides DOC memoranda, including a
5    memorandum stating that in May 2021, in light of prison bed vacancies and the opportunity to
6    advance DOC's "reentry mission," the MCC WSR was among several facilities being considered
7    for closure.  Dkt. 29, at 74.  In July 2021, MCC officials including defendant Jackson wrote a
8    memorandum stating that due to a reduction in the prisoner population, the possible closure of
9    units including in the WSR, loss of staff, and a hiring freeze, MCC would be consolidating units.
10   Dkt. 29, at 104.  An MCC-specific memorandum provides testing schedules for units where
11   prisoners, staff, or volunteers test positive for COVID-19.  *See* Dkt. 29, at 101.  Under this
12   schedule, if a prisoner has a confirmed case of COVID-19, that prisoner's unit will be
13   quarantined and tested regularly.  Dkt. 29, at 101.

14   **III. Defendants' Evidence**

15   Michael Obenland, a DOC assistant secretary for prisons, provides his declaration that
16   statewide, prison admissions have decreased by more than half from March 2020 to June 2021,
17   compared to the same time frames in 2019 and 2020.  Dkt. 24, at 2.  As of July 20, 2021,
18   approximately 4,000 of 17,000 prison beds in Washington State were empty, and DOC expects
19   that number to increase.  Dkt. 24, at 2.  In addition, the 2021 to 2023 State budget requires DOC
20   to reduce prison spending by $80 million over that period.  Dkt. 24, at 2.  In the face of this
21   decrease in funding and increase in vacant beds, DOC intends to consolidate units within
22   facilities, to then conduct "low-impact" closures, and to finally conduct "high-impact" closures.
23   Dkt. 24, at 2.

24

1       Obenland explains that individuals in C and D (long-term minimum custody level) units of the WSR were consolidated into A and B (medium custody level) units of the WSR in anticipation of the closure of all WSR units. Dkt. 24, at 3. Plaintiff is an individual moved from a single-cell in C unit to a double-bunk cell in B unit. Dkt. 24, at 4. According to Obenland, the "vast majority of cells within DOC are occupied by two incarcerated individuals." Dkt. 24, at 4. However, this reassignment "will be temporary" and DOC anticipates closing all WSR units "sometime in October." Dkt. 24, at 4.

      Defendant Jackson, the MCC superintendent, states that the A and B units are 6 by 9 feet and can collectively house 632 prisoners. *See* Dkt. 25, at 2. As of August 30, 2021, the WSR held 461 prisoners. *See* Dkt. 20, at 2. Further, defendant Jackson states that there have been no fights in the A or B units since consolidation, that WSR resolves maintenance issues when they learn of such issues, that unit staff maintain the WSR noise level, and that there have been no fights, impacts on heating or cooling, or concerns with ventilation in the A or B units since consolidation. *See* Dkt. 25, at 2–3 (noting that the only fight was in the 3A segregation unit where community custody violators reside).

      Specifically regarding "Covid stations," defendant Jackson states that although WSR had a Regional Care Facility to house prisoners with COVID-19, the fire department did not approve that Facility. Dkt. 25, at 3. Instead, the WSR established isolation units in the Intensive Management Unit ("IMU") as well as an isolation area in the gym and a Rapid Deployment Regional Care facility in the "TRU yard." Dkt. 25, at 3. The gym isolation area has since been removed "as numbers have reduced significantly." Dkt. 25, at 3. The care facility has been moved to another area within "TRU" and reduced in size. Dkt. 25, at 3.

Defendant Jackson explains that when a prisoner tests positive for COVID-19 or shows COVID-19 symptoms, the prisoner is placed in the IMU for isolation. Dkt. 25, at 3. In direct contradiction to plaintiff's evidence, defendant Jackson claims that isolated prisoners have access to their property, phones, mail, and television, as well as too health services staff. Dkt. 24, at 4.

DOC's infectious disease physician also provides a declaration describing DOC's COVID-19 response. Dkt. 26-1. DOC guidance requires isolating and requiring masking by symptomatic prisoners, quarantining exposed close contacts and cellmates, and quarantining confirmed cases and symptomatic patients. *See* Dkt. 26-1, at 2. Moreover, she states that DOC has offered all DOC patients COVID-19 vaccination. Dkt. 26-1, at 2. The MCC Facility Medical Director also provides a declaration stating that plaintiff is fully vaccinated and, in the medical director's opinion, at low risk of severe illness, hospitalization, or death from contracting COVID-19. Dkt. 27, at 2.

Each of these declarations is subscribed to under penalty of perjury, and the Court denies plaintiff's request to strike the declarations. *See* Dkt. 28; *see also* 28 U.S.C. § 1746.

## DISCUSSION

**I. Legal Standard**

Temporary restraining orders are governed by the same standard applicable to preliminary injunctions. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n. 2 (1977). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

With respect to the showing that a plaintiff must make regarding his chances of success on the merits, the Ninth Circuit applies a sliding scale approach. "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). So long as the other two elements are met, "a preliminary injunction is appropriate when plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Id.* 1134–35 (internal formatting and citation omitted).

The burden to achieve injunctive relief is particularly high when a party seeks a mandatory injunction. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Mandatory injunctions go beyond an injunction preventing a party from acting, and thus beyond mere maintenance of the status quo, requiring a party to act. *Id.* Such a request should be denied unless the facts and law "clearly favor" the moving party. *Id.* (internal quotation marks and citation omitted).

Although the Court generally defers to prison administrators on matters of prison administration (*see Sandin v. Conner*, 515 U.S. 472, 483 (1985)), this deference does not require the Court to give administrators *carte blanche* to violate prisoners' constitutional rights. *Criswell v. Boudreaux*, No. 1:20-CV-01048-DAD-SAB, 2020 WL 5235675, at *20 (E.D. Cal. Sept. 2, 2020).

**II. Scope of the Proposed Injunction**

As a preliminary matter, the Court addresses issues with the scope of plaintiff's requested injunctive relief. Plaintiff asks that the Court "stop[] double bunking" at the WSR and halt "transporting prisoners in a pandemic." Dkt.8, at 12.

1    But plaintiff did not allege that transportation to other institutions violated the
2    Constitution in his complaint, so that the Court does not have authority to provide relief related
3    to the transportation of prisoners out of the WSR (rather than relief related to the consolidation of
4    units within the WSR).  *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631,
5    633 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not pled in the
6    complaint, the court does not have the authority to issue an injunction.").

7    Separately, the Court observes that plaintiff's allegations about the allegedly punitive
8    nature of the COVID-19 segregation and treatment procedures cannot justify an injunction
9    halting double-bunking.  Plaintiff essentially argues that MCC officials are purposely
10   discouraging COVID-19 self-reporting by prisoners in order to maintain the illusion of low case
11   numbers.  Even if these claims showed a likelihood of success on the merits of plaintiff's
12   deliberate indifference allegations or otherwise met the requirements to issue preliminary
13   injunctive relief, by statute, this Court is forbidden from entering prospective relief in this action
14   unless that relief is "narrowly drawn, extend[s] no further than necessary to correct the harm the
15   court finds requires preliminary relief, and [is] the least intrusive means necessary to correct that
16   harm." 18 U.S.C. § 3626(a)(2).  Plaintiff requests an injunction returning the WSR to single-
17   bunk status.  But there are clearly far less restrictive and narrower means of remedying harms
18   related to the COVID-19 segregation practices than requiring that prisoners be returned to double
19   bunk status or directing the WSR to return to the previous residential arrangements.

20   Therefore, the Court recommends denying the motion for a TRO and permanent
21   injunction to the extent that plaintiff seeks to have the Court order the WSR to cease transporting
22   prisoners to other institutions.  And the motion should be denied inasmuch as plaintiff relies on
23   his argument that the WSR's COVID-19 segregation practices in IMU units violate the Eighth
24

1 | Amendment. The Court turns to whether plaintiff is likely to succeed on the merits of his claim
2 | that consolidation of the WSR units has resulted in overcrowding conditions that violate his
3 | Eighth Amendment rights.

### III. Likelihood of Success on the Merits

#### A. Legal Standard

The Eighth Amendment imposes an obligation on defendants to protect the people in their custody because they cannot protect themselves. *See Helling v. McKinney*, 509 U.S. 25, 32 (1993) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment." (Internal formatting and citation omitted.)).

To establish an Eighth Amendment violation, plaintiffs must show an objective and a subjective component: that is, they must show that they were "confined under conditions posing a risk of 'objectively, sufficiently serious' harm and that the officials had a 'sufficiently culpable state of mind[.]'" *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995)). "The subjective component requires the inmates to show that the officials had the culpable mental state, which is deliberate indifference to a substantial risk of serious harm." *Id.* (internal citation and quotation marks omitted). "Deliberate indifference" is established only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "A prison official's

1  duty under the Eighth Amendment is to ensure reasonable safety," and "prison officials who act
2  reasonably cannot be found liable[.]" *Farmer*, 511 U.S. at 844–45.

### B. Deliberate Indifference

For purposes of this Report and Recommendation, the Court assumes without deciding that plaintiff is being subjected to a sufficiently serious risk of harm of contracting COVID-19 to implicate the Eighth Amendment and focuses on whether there is a likelihood that plaintiff can establish that defendants are deliberately indifferent to that harm.

The parties dispute whether the WSR is overcrowded. Plaintiff alleges that consolidation resulted in the WSR being at 158% of capacity. Dkt. 7, at 7. Defendants argue that the WSR is actually below capacity. Dkt. 23, at 16.

Standing alone, allegations of double-celling and overcrowding do not show a violation of the Eighth Amendment. *Doty v. Cnty. of Lassen*, 37 F.3d 540, 545 n.1 (9th Cir. 1994); *Hoptowit v. Ray*, 682 F.2d 1237, 1248–49 (9th Cir. 1982), *abrogated in part on other grounds by Sandin*, 515 U.S. 472; *Rhodes v. Chapman*, 452 U.S. 337, 348–49 (1981). Instead, the overcrowding or double-celling must be shown to have led to specific conditions violating the Eighth Amendment. *See Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 471 (9th Cir. 1981) ("Technically, it may be said that the prison is 50% 'overcrowded,' but this fact has no constitutional significance standing alone. . . . Only when overcrowding is combined with other factors such as violence or inadequate staffing does overcrowding rise to an eighth amendment violation."); *see also Akao v. Shimoda*, 832 F.2d 119, 120 (9th Cir. 1987) (per curiam).

That officials implemented practices that resulted in overcrowding during the COVID-19 pandemic does not necessarily amount to an Eighth Amendment violation, either. *See Sanford v. Eaton*, No. 1:20-CV-00792-BAM-PC, 2021 WL 3021447, at *7 (E.D. Cal. July 16, 2021)

1 (citing *Booth v. Newsom*, No. 2:20-cv-1562 AC P, 2020 WL 6741730, at *3 (E.D. Cal. Nov. 17, 2020); *Blackwell v. Covello*, No. 2:20-CV-1755 DB P, 2021 WL 915670, at *3 (E.D. Cal. Mar. 10, 2021)). Rather, to prevail on his claims, plaintiff would need to show that defendants did not reasonably respond to the risk of harm. *Accord Sanford*, 2021 WL 3021447, at *8 ("The key inquiry is not whether Defendants perfectly responded, complied with every CDC guideline, or whether their efforts ultimately averted the risk; instead, the key inquiry is whether they 'responded reasonably to the risk.'" (Internal citation omitted.)).

Defendants assert that they are, in fact, taking precautions to mitigate the spread of COVID-19. As noted, they have provided evidence that prisoners are required to wear masks, that symptomatic prisoners are isolated from the rest of the population, that exposed prisoners are quarantined, and that all prisoners have been offered a COVID-19 vaccination. Dkt. 24, at 4; Dkt. 25, at 3–4; Dkt. 26-1, at 1–2; Dkt. 27, at 2.

DOC's statewide infectious disease physician states that—

> Per DOC Health Services' Clinical Guidance, individuals who show symptoms of COVID-19 will be directed to don a surgical mask, if they are not already wearing one, to minimize the potential spread of the virus and are immediately placed in medical isolation. Their cellmates and other close contacts will be immediately quarantined until they can be evaluated by a medical provider. . . .
>
> . . . Under the DOC Health Services' Clinical Guidance, most patients with laboratory confirmed COVID-19 will remain in medical isolation until they have been symptom-free for 14 days or are clinically improving by day 20. Symptomatic patients who test negative for COVID-19 twice and do not have a documented or confirmed alternative diagnosis to explain their symptoms will remain in isolation until they have been symptom-free for 72 hours. Individuals who have no symptoms, but have been exposed to those who tested positive for COVID-19 will be quarantined for 14 days. If symptoms develop or a test result is positive during quarantine, the patient will be moved to medical isolation.

Dkt. 26-1, at 3. Indeed, plaintiff's own materials include evidence that DOC is taking precautions to mitigate the spread of COVID-19 at the WSR. Prisoners must wear masks (*see*

REPORT AND RECOMMENDATION - 12

1  Dkt. 8, at 6), and the MCC has procedures in place for quarantining and testing when staff and
2  prisoners test positive.  *See* Dkt. 29, at 101.

3        Plaintiff asserts that prisoners are not being tested for COVID-19, but his own
4  submissions in support of his motion include another prisoner's declaration stating that two
5  prisoners at the Twin Rivers facility at MCC were tested for COVID-19 and that there was a
6  positive case (resulting from testing) at WSR.  Dkt. 29, at 31.  A separate prisoner's declaration
7  also indicates that prisoner was tested four times after exposure to COVID-19 before being
8  returned to his unit.  Dkt. 29, at 83; *see also* Dkt. 29, at 87 (prisoner's declaration that he was
9  tested before being returned to his unit).  Plaintiff's blanket assertion that prisoners are not being
10 tested for COVID-19 is contradicted by these other declarations and materials.

11       Another prisoner provides a declaration that handwashing sinks were only recently
12 provided, that little to no hand soap is available, and that the facility is not cleaned.  Dkt. 29, at
13 83.  As noted, plaintiff also generally asserts because of the punitive nature of segregation for
14 symptomatic prisoners, prisoners are refusing to self-report symptoms.  If true, these allegations
15 are concerning, but, as discussed above, the Court could grant preliminary injunctive relief to
16 cease double-bunking and return the MCC to its previous residential arrangements only if such
17 broad injunctive relief was the "least intrusive means necessary to correct that harm."  18 U.S.C.
18 § 3626(a)(2).  There are clearly less intrusive ways and better tailored means to increase
19 sanitation and reduce the punitive nature of segregation.

20       Moreover, the Court observes that there is no dispute in the materials submitted that the
21 WSR will be closed by the end of October 2021.  *See* Dkt. 24, at 4.  The temporary nature of the
22 consolidation also counsels against granting preliminary injunctive relief.

As for plaintiff's claims related to threats of violence due to double-celling, plaintiff has not alleged specific facts demonstrating that overcrowding increased violence in a manner that posed a particularized and imminent threat of harm to plaintiff. Plaintiff's conclusory allegations about increased noise, lack of ventilation, and various other matters also fail to amount to allegations that he has been deprived of the minimal civilized measures of life's necessities to such an extent as to violate the Eighth Amendment. *See Farmer*, 511 U.S. at 834. Plaintiff makes much of a consent decree formerly in place but does not provide the specifics of this consent decree or evidence regarding appropriate cell sizes other than his own belief that the square footage of his cell is too small. He also acknowledges that this decree has been vacated— and in any event, as the Court previously noted, overcrowding alone is not enough for plaintiff to establish an Eighth Amendment violation.

The Court recently recommended denial of a similar motion to reverse the consolidation of WSR units during COVID-19. *See* Dkt. 26, *Ejonga-Deogracias v. Strange, et al.*, 2:21-cv-01004-RJB-JRC. As the Court explained in that Report and Recommendation, rulings granting preliminary injunctive relief in other district courts in this circuit have not involved similar circumstances to those presented at the WSR, counseling against granting preliminary injunctive relief in this case. In *Chatman v. Ohani*, for instance, the District of Hawai'i granted preliminary injunctive relief where prisoners provided evidence of failure to screen or test new and transferred prisoners for COVID-19; that prisoners with unknown COVID statuses were mixed with others in shared spaces; that social distancing was not observed and sanitation was so poor that prisoners "are forced to urinate on themselves, on walls, or in cups"; that mask wearing was "inconsistent at best with minimal enforcement, if at all"; that cleaning supplies were not provided or were watered down; and that prisoners with medical conditions were neither isolated

REPORT AND RECOMMENDATION - 14

nor identified as high risk. No. CV 21-00268 JAO-KJM, 2021 WL 2941990, at *15–18 (D. Haw. July 13, 2021). That Court observed that prison administrators had clearly acted with deliberate indifference by—

> knowingly (1) transport[ing] symptomatic inmates from a facility with an active COVID-19 outbreak, (2) who told staff they were ill, (3) who were infected, (4) but whose infections were unconfirmed due to late or no testing, (5) on an airplane, (6) to a facility with no active COVID-19 cases that previously experienced an outbreak, and (7) then hous[ing] those inmates with COVID-negative inmates.

*Id.* at 19 (emphasis removed). And in another example, the Eastern District of California granted preliminary injunctive relief where prison administrators refused to implement an effective testing plan (thereby guaranteeing prisoner exposure to COVID-19), prohibited the use of masks at one point and limited the use of soap, and failed to memorialize any policies in response to the virus. *See Criswell*, 2020 WL 5235675, at *20. This case falls short of such circumstances.

Because plaintiff shows neither a likelihood of success on the merits nor that he has raised serious questions going to the merits, his motion must be denied. The Court does not discuss the other factors that plaintiff must establish to obtain preliminary injunctive relief because the failure to show even a serious question going to the merits is dispositive of this matter.

## CONCLUSION

For the reasons set forth above, the Court recommends denying the motion for a TRO and preliminary injunction. Dkt. 8.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

REPORT AND RECOMMENDATION - 15

1 | review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those
2 | objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*
3 | *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted).  Accommodating the time limit
4 | imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **November 5,**
5 | **2021,** as noted in the caption.

      Dated this 15th day of October, 2021.

J. Richard Creatura
Chief United States Magistrate Judge